UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DIXIE MARINE, INC.                          CIVIL ACTION

VERSUS                                      NO: 16-12415

Q JAKE M/V, ET AL.                          SECTION: "J"(2)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This litigation arises out of a mooring incident at the Andry Street wharf on January 26, 2016, involving Defendant M/V Q JAKE ("Q JAKE") and Plaintiff Dixie Marine, Inc. ("Dixie Marine"). Dixie Marine sued the Q JAKE *in rem* claiming the vessel negligently damaged Dixie Marine's wharf while attempting to dock. The Q JAKE responded by asserting a negligence counterclaim against Dixie Marine.

The Court held a bench trial on July 17 and 18, 2017, and took the matter under advisement. Having considered all the evidence and counsels' arguments, the Court issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

### 1.

Plaintiff, Dixie Marine, is a ship repair business that leases the Andry Street wharf, located on the Mississippi River in New Orleans, Louisiana, from the Port of New Orleans ("Port").

### 2.

Defendant, M/V Q JAKE, is owned by Q JAKE Shipping Ltd, which entered a restricted appearance on behalf of the vessel under Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims.

## The Q JAKE/Andry Street Wharf Incident

### 3.

The Q JAKE is a 750 foot bulk cargo carrier. The Q JAKE's deadweight tonnage capacity (DWT) – i.e., the maximum weight of cargo, stores, fuel, etc. the vessel can safely carry – is 82,188 metric tonnes (MT). When fully loaded, the Q JAKE displaces (i.e., weighs) 94,590 MT. Unladen, the Q JAKE displaces approximately 12,400 MT.

### 4.

On January 20, 2016, the Q JAKE completed loading a cargo of soybeans at the ADM Terminal in Reserve, Louisiana. After loading, the Q JAKE displaced approximately 75,000 MT and drew over 40 feet. The Mississippi River was high at this time and near flood stage with strong currents.

5.

At approximately 12:37 p.m., while heading down bound on the Mississippi River, the Q JAKE collided with drifting barges that had broken away from the United Bulk Terminal Facility. The collision punctured the Q JAKE's hull, near the port bow. The Q JAKE anchored at Magnolia anchorage where it awaited the United States Coast Guard and assessed the damage.

6.

The Q JAKE contracted with Boland Marine & Industrial, LLC ("Boland") to perform the hull repairs. Boland's wharf was full, so Boland coordinated verbally with Dixie Marine for the use of the Andry Street wharf.

7.

The Andry Street wharf is a T-head type pier consisting of an approach roadway that runs perpendicular to the shoreline and a main pier platform that runs parallel to the shoreline. The wharf is approximately 900 feet long.

8.

Along the riverside edge of the wharf are thirteen (13) fifty-ton (50T) bollards, spaced approximately sixty (60) feet apart. Bollards are used to moor and secure a vessel to a wharf or other structure.[1]  For the purposes of trial, the bollards were numbered

---

[1] The mooring bollards in this case are cast steel attachment points with a rectangular base of about two feet by three feet and a bulbous head that stands approximately two feet off the base.

consecutively beginning with bollard no. 1 on the furthest upriver portion of the wharf and ending with bollard no. 13 on the furthest downriver portion. Each mooring bollard is attached to the underlying dock substructure with four one-inch diameter anchor bolts.

9.

The wharf is composed of two main sections pertinent to the issues in this case: (1) the upriver work platform and (2) the main wharf platform. The upriver work platform, containing bollards nos. 1 and 2, is approximately 100 feet long and is connected to the main wharf platform by a walkway. The main wharf platform is 560 feet long and supports bollards nos. 3 through 13.

10.

On January 26, 2016, the Mississippi River was at a height of 16.38 feet on the Carrollton Gage, which was near flood stage. At 7:34 a.m. that same day, the Q JAKE left Magnolia anchorage and proceeded to the Andry Street wharf. At 11:45 a.m., compulsory pilot Steven Vogt ("Pilot Vogt") took command of the vessel.

11.

Under the command of Pilot Vogt, the Q JAKE attempted to dock at the Andry Street wharf with the assistance of two tugs, the J.K. MCLEAN and the MIRIAM COOPER. The J.K. MCLEAN is a Z-drive propulsion tractor tug with a rated horsepower of 5,360. The MIRIAM COOPER is a twin screw conventional tug with a rated horsepower of

4,200. Pilot Vogt positioned the J.K. MCLEAN on Q JAKE's bow and the MIRIAM COOPER on Q JAKE's stern.

12.

At approximately 1:45 p.m., the first mooring line went out to the wharf. The Q JAKE's bow was facing upriver near bollard no. 1 and its stern near bollard no. 13. At the direction of Pilot Vogt via VHS radio, line handlers began tying the mooring lines to bollards nos. 1, 2, 3, 7, 9, and 13.

13.

At 1:55 p.m., bollard no. 7 failed but remained partially attached to the wharf. The Q JAKE's aft spring line also parted and the Q JAKE shifted off the wharf.

14.

Due to the strong current pushing the bow off the wharf, Pilot Vogt called in additional tug assistance. The ANGUS R. COOPER arrived to assist at 2:31 p.m. and the CAPT. JIMMY T MORAN ("JIMMY T") arrived at 2:55 p.m.

15.

After the first mooring attempt, Walter Haley, a Boland employee, informed Dixie Marine's Vice President of Operations, Robbie Dendinger, of the damage to bollard no. 7. Dendinger arrived at the wharf as the Q JAKE was making its second mooring attempt.

At 3:08 p.m., the Q JAKE was parallel against the wharf with all four tugs in position to commence mooring operations.

17.

At 4:20 p.m., all twelve lines were secure to bollards nos. 1, 2, 3, 6, 9, and 13 with two lines to each bollard. Pilot Vogt then released the JIMMY T and Dendinger departed the wharf. Three tugs, the ANGUS COOPER, the J.K. MCLEAN, and the MIRIAM COOPER, remained to assist the Q JAKE.

18.

At 4:50 p.m., the forward bollards nos. 1 and 2 failed and ripped completely off the wharf and the Q JAKE came off the wharf by the bow.

19.

Shortly after the second failed attempt, the Q JAKE's master and Pilot Vogt agreed to abandon the mooring at the Andry Street wharf. The Q JAKE temporarily berthed without incident at the Alabo Street wharf from 6:10 p.m. until 7:20 p.m. using the same three tugs, the J.K MCLEAN, the MIRIAM COOPER, and the ANGUS R. COOPER. Around 8:00 p.m., the Q JAKE moved to the Poland Avenue wharf, again using the same three tugs. Both the Alabo Street and Poland Avenue wharfs are in close proximity to the Andry Street wharf and are equipped with the same 50T bollards.

## The Q JAKE's Mooring Operations at the Andry Street Wharf

20.

At the time of the incident on January 26, 2016, the Q JAKE's crew was sufficiently rested in compliance with 46 CFR 15.1111.[2]

21.

The Court finds that the Q JAKE was equipped with and properly utilized sufficient mooring equipment for a vessel of its size during high river conditions. There was no evidence of the crew mishandling or improperly securing the lines. Twelve lines, two lines per bollard, is the industry standard, reasonable under the circumstances, and should have been sufficient to hold the Q JAKE in place at the Andry Street wharf in high river conditions.[3] The Q JAKE used 17 mooring lines at the Poland Avenue wharf merely out of an abundance of caution. Both parties' experts acknowledged that a line should typically part before a dock bollard is damaged.[4]

22.

Dixie Marine claims that the sudden parting of the stern lines created sudden shock loads (i.e. loads shifting from one line to the other) which caused the vessel's weight to shift upriver and the vessel's lines to rip the bollards from the wharf. [5] Dixie

---

[2] Exhibit 66, Q JAKE Crew ILO Rest Hour Records.
[3] *See* Captain Ryan's testimony; Exhibit 67 at 1, Q JAKE Mooring Arrangement Plan.
[4] *See* Captain Ryan testimony; William Janowsky testimony; Captain Scruton testimony; Exhibit 117 at 6, Captain Scruton Report.
[5] Exhibit 117 at 6, 7, Captain David Scruton Report.

Marine's theory of the incident relied heavily on the testimony of Walter Haley, a Boland employee and eyewitness to the mooring attempts. Haley testified that on both attempts the sudden parting of stern lines caused the Q JAKE's stern to swing out, which in turn exerted excessive force on the other bollards. Haley also testified that the Q JAKE used only six lines on its first attempt, and twelve on the second. Haley stated that he witnessed approximately 150 vessel berthings per year. Although Haley claimed that this incident in particular was more memorable than others, the Court finds his testimony unconvincing in light of other objective evidence directly contradicting his testimony and Dixie Marine's theory. Specifically, the MRTIS video[6] shows that the vessel's bow – not its stern – swung out from the wharf on both attempts.

23.

The Court also finds the Q JAKE's experts more credible and their conclusions more persuasive. [7] In particular, the Court is persuaded by the testimony and report of the Q JAKE's mooring and

---

[6] MRTIS is a database of marine vessel traffic on the lower Mississippi River. Vessels equipped with an AIS(Automatic Identification System) transmit data via satellite to the MRTIS database. Exhibit 75, MRTIS AIS Data Recording.

[7] The Court also gives little weight to the testimony of Captain David Scruton, Dixie Marine's expert on vessel navigation and mooring. Captain Scruton opined that shock loading caused the bollards to fail; however, his opinion was based on the belief that the stern of the ship swung out after the stern lines parted. Furthermore, Captain Scruton's report did not take into account certain factors such as the Q JAKE's mooring winch brake rendering points or the elasticity of the mooring lines. Captain Scruton's analysis also erroneously concluded that only two tugs assisted the Q JAKE on the second attempt when, in fact, four tugs assisted. Exhibit 117 at 7, Captain Scruton Report.

navigation expert, Captain Maurice Ryan, who testified that although the mooring lines had a breaking load of 89 tonnes, shock loads could not be a significant factor to the bollards' failure because the elasticity of the mooring lines and the rendering point of the mooring winch brakes would minimize shock loads. [8]

24.

The Court finds that the Q JAKE was not obligated to utilize additional tugs on its mooring attempts. Pilot Vogt is an experienced Mississippi River pilot having piloted several vessels of the same size and draught as the Q JAKE under similar high river conditions.[9] Based on his seventeen years of experience and taking into account the river conditions as well as the condition of the Q JAKE, Pilot Vogt felt that two tugs, one of which was a Z-drive propulsion tractor tug, was appropriate under the circumstances for the first mooring attempt. Pilot Vogt testified that tractor tugs are particularly useful and efficient due to their increased horsepower and maneuverability. The Court again finds the testimony and report of the Q JAKE's expert, Captain Maurice Ryan, particularly compelling. Captain Ryan, who has berthed similar sized vessels many times in the Mississippi River, including in

---

[8] The Q JAKE was equipped with six double drum mooring winches which were set to render at 42.04 tonnes. The mooring lines had a breaking load of 89 tonnes and a 12% elongation factor (i.e. elasticity) which allowed the lines to absorb energy under load. Exhibit 118 at 6, Captain Maurice Ryan Report; Exhibit 53, Q JAKE Mooring Winches Brake Holding Tests; Exhibit 59, Q JAKE Mooring Line Certificates.
[9] Testimony of Captain Steven Vogt.

high river conditions, stated that Pilot Vogt's discretion for utilizing two tugs during the first mooring attempt was the industry standard for that size vessel under those river conditions.[10] Captain Ryan also confirmed that it was proper for Pilot Vogt to position the stronger, more capable tractor tug, the J.K. MCLEAN, on the bow of the vessel. Pilot Vogt testified that he and the Q JAKE's master were in constant communication with one another and that throughout the mooring attempts, the master never expressed any concern over the number of tugs. He also stated that there were no issues with the tug captains or line handlers following his commands.

Dixie Marine's navigation expert, Captain Scruton, who has never berthed a vessel in the Mississippi River as a master, testified that two tugs were insufficient for the Q JAKE during high river conditions. However, Captain Scruton drew this conclusion based only on the number of tugs and without considering their respective horsepower. The Court agrees with Captain Ryan's testimony that consideration of the capabilities of the tugs and not just the number of them is paramount in forming an opinion on this issue.

---

[10] Exhibit 118 at 5, Captain Ryan Report.

After the first attempt was unsuccessful, Pilot Vogt promptly called for additional tug assistance before he made another attempt. After all lines were secure, Pilot Vogt released one of the four tugs. Captain Ryan's report stated that this was reasonable and in line with the industry standard for a pilot. Bollards nos. 1 and 2 failed thirty minutes after the JIMMY T departed, despite the fact that all lines were secure and three tugs were assisting the Q JAKE. Furthermore, the same three tugs were used to dock the Q JAKE at the Poland and Alabo Street wharves and did so without incident. Accordingly, the Court finds the decision to release the forth tug after the second mooring attempt was not unreasonable.

## Condition of the Andry Street Wharf

26.

Dixie Marine has operated the Andry Street wharf since the 1960s when it was a timber structure. Under its lease with the Port, Dixie Marine is responsible for all maintenance and repairs of the wharf and for keeping it in a safe condition for its intended purpose of berthing vessels. Dixie Marine has made repairs to the wharf over the years by adding various reinforcements with steel and concrete.

27.

The upriver work platform, containing bollards nos. 1 and 2, has a four to five inch thick concrete deck supported by steel piles. The upriver work platform is connected to the main wharf platform by a steel and concrete walkway.

28.

The main wharf platform supports bollards nos. 3 through 13. The furthest downriver section of the main platform (i.e., approximately bollards nos. 8 through 13) is constructed with steel piles and a concrete deck, similar to the upriver work platform. However, the other portion of the main wharf platform (i.e., approximately bollards nos. 3 through 7) still has elements of the wharf's original timber structure. Specifically, beneath the concrete deck and above the steel piles, the substructure contains timber cap beams and timber stringers. In between the main wharf platform and the shore is a timber deck area which was structurally segregated from the main wharf area in 2015 due to its excessively deteriorated condition.

29.

Since 2008, Dixie Marine has conducted three repair projects relating to the wharf's structure totaling $433,125.00. For each repair project at Dixie Marine, local engineer Don Barnes of Barnes Engineering Company, Inc. ("Barnes Engineering") provided the

specifications, the Port approved and permitted the repairs, and contractor Durward Dunn, Inc. performed the repairs.

30.

The first repair project was in 2009 when Dixie Marine repaired some damaged piles and concrete after a towing vessel allided with the upriver work platform. The project cost $229,890.00.

31.

In 2012, a vessel moored at Andry Street wharf and ripped off bollard no. 4. Dixie Marine did not replace bollard no. 4 before the Q JAKE incident.

32.

After a fire at the wharf in 2013, the Port became aware of the unsafe condition of the timber substructure and circulated a memorandum documenting that the main wharf substructure and the approach ramp were found to be "in such poor structural condition because of age and rot that the timber substructure has failed," that "it is highly probable that additional substructure will collapse without warning," and the conditions "present a threat of loss of life and/or destruction of additional infrastructure."[11] The memorandum also documents that the Port notified Dixie Marine of its findings.

---

[11] Exhibit 93, 3/18/13 Port Interoffice Memo.

33.

In June 2013, Dixie Marine conducted its second repair project to address the fire damage along the mid-fender line of the main platform. The project cost $127,000.00 and included *inter alia* replacing the concrete foundation and the timber stringer supporting bollard no. 6.

34.

In July 2013, the Port was still concerned about the wharf's condition and asked Waldemar S. Nelson and Co., an engineering and architectural firm, to perform a general condition survey limited to a visual inspection. The report ("2013 Nelson Report") revealed damaged areas of the wharf that significantly reduced the capacity of the structure.[12] The Port commissioned a more detailed report in early 2014 ("2014 Nelson Report").[13]

35.

The 2014 Nelson Report offered five repair options at various costs with corresponding maximum allowable berthing loads if completed. In particular, Option 1 would have allowed a maximum berthing load of 35,000 DWT and would have cost $80,000. Option 3 would have allowed a maximum berthing load of 95,000 DWT and would have cost $450,000.

---

[12] Exhibit 5 at 3, 2013 Nelson Report.
[13] Exhibit 3, 2014 Nelson Report.

36.

By letter dated January 15, 2015, Dixie Marine responded to the 2014 Nelson Report stating that it "represent[ed] a fair and honest evaluation of Andry without any bias to either The Port or [Dixie Marine]."[14] However, Dixie Marine continued that "current market conditions preclude[d] the investment needed to return the severely damaged areas to working condition." Therefore, Dixie Marine suggested that "[u]nless the Port is [1] willing to invest in the Wharf or [2] the Port has another facility on the River it can make available to [Dixie Marine], then [it] ha[d] no choice but to continue use of the Wharf, as is, and deal with the deficiencies and issues of a 60+ year-old dock located immediately downriver from the Inner Harbor Navigation Canal."

37.

The Port responded by letter dated January 30, 2015 acknowledging Dixie Marine's preference for deferring repairs "as long as it can."[15] However, the Port explained that the 2014 Nelson Report "outlines minimal repairs that are required for Dixie to continue its typical operations.[16] The Port relayed that the cost for these minimal repairs would be $80,000.00 and would allow a

---

[14] Exhibit 80 at 1, 1/15/15 Dixie Marine Response to Nelson Report.
[15] Exhibit 101 at 1, 1/30/15 Letter from the Port to Kronenberger.
[16] The minimal repairs included disconnecting the timber deck area "from the remainder of the wharf to stop the progression of damage, performing some horse leg repairs of timber piles, and barricading off an area of a missing steel pile." The Port also recommended that the fender system be replaced.

maximum berthing load of 35,000 DWT (i.e., Option 1). The Port placed the burden for repairs on Dixie Marine as per the lease but stated that "If Dixie requires different [than 35,000 DWT] allowable loading, or has an alternate plan, to let [the Port] know."

38.

In response, Dixie Marine commenced its third repair project ("2015 repairs") and commissioned Don Barnes to submit repair specifications based on the 2014 Nelson Report. In June 2015, the Port approved of the repair specifications which cost $76,235.00.[17]

39.

Between 2013 and 2016, neither of the Nelson Reports nor the Barnes repair specifications mentioned the mooring bollards or the mooring capacity of the wharf. Instead, they focused exclusively on addressing the berthing and live load capacity of the wharf. The Court understands berthing capacity to mean the wharf's ability to withstand lateral forces that are exerted onto it as a vessel is placed in a desired position; live load capacity to mean the wharf's ability to withstand force or weight placed on top of the wharf; and mooring capacity to mean the wharf's ability to secure and hold a vessel in place by the attachment of mooring lines to

---

[17] Rather than repairing the timber piles with horse legs, Dixie Marine installed additional steel piles and steel cap beams on the downriver portion of the main wharf "as needed," but it did not install a new fendering system.

bollards on the wharf. The Court also understands, based on the expert testimony at trial, that berthing and live load calculations would factor into a mooring analysis; however, a mooring analysis requires a more comprehensive examination of, *inter alia*, the entire wharf structure and the vessel.

40.

Dixie Marine provided Nelson with some information about the vessels that have previously docked at the wharf. Specifically, Dixie Marine informed Nelson of the deadweight tonnage (DWT) capacity of the vessels that have docked at the wharf. As previously explained, DWT is the maximum weight of cargo, stores, fuel, etc. the vessel can safely carry. Nelson also learned that the wharf is used for vessel repairs and, consequently, that the vessels are typically loaded to less than 5% of the DWT capacity. Based on that information, Nelson made three important assumptions in its 2014 Nelson Report analysis: (1) the wharf berthed lightweight vessels[18]; (2) the LWT of a vessel was between 20 and 30% of its DWT; and (3) the vessels were loaded to 5% capacity. In other words, Nelson assumed, based on the information that Dixie Marine provided, that the displacement of the vessels docking at Andry Street wharf was about 35% of their DWT.

---

[18] The Court understands lightweight to mean the weight of unladen vessels (LWT).

Dixie Marine claims that it provided a safe berth to the Q JAKE because its 2015 repair project satisfied Option 3 of the 2014 Nelson Report, giving the wharf a maximum berthing capacity of 95,000 DWT. However, Dixie Marine misconstrues the Nelson Report's findings. Even assuming that Dixie Marine's 2015 repairs satisfied Option 3, a maximum allowable capacity of 95,000 DWT meant that the wharf could berth a vessel that displaced (i.e., weighed) no more than 33,250 MT.[19] Although the Q JAKE was a 82,188 DWT vessel, its displacement on the day of the incident was actually around 75,000 MT, which is more than twice the wharf's allowable amount. Barnes, Dixie Marine's expert, admitted at trial that a loaded vessel exerts a greater force on a wharf because currents and wind impact the vessel more when it is deeper in the water.

42.

Dixie Marine's Vice President, Robbie Dendinger, testified that Haley "may have suggested" to him that the vessel was fully laden with cargo. Dendinger further stated that even if he was aware of that information, he still would have approved the wharf's

---

[19] Applying the calculation outlined in the 2014 Nelson Report, vessels were assumed to be lightweight (20 to 30% of the DWT) plus 5% capacity (5% of DWT). Therefore, applying the upward end of the calculation (35%) to the maximum allowable DWT for Option 3 (95,000 DWT), the wharf could berth vessels that displaced no more than 33,250 MT.

docking of the Q JAKE because, according to Dixie Marine, the wharf had no limitations to its use.

43.

Contrary to Dixie Marine's claims, the 2015 repairs did not permit Dixie Marine to safely operate the wharf without limitation or restriction. Dixie Marine was aware that the 2015 repair specifications were based on the 2014 Nelson Report, which was limited in scope as a general condition survey and did not address the mooring capacity of the wharf. Dixie Marine was also aware that the analysis assumed that vessels would be in light condition.[20] Even if the Court assumes that (1) the 2015 repairs satisfied Option 3 of the 2014 Nelson Report and (2) that the respective allowable *berthing* capacity equated to an allowable *mooring* capacity, the wharf was far from capable of safely accommodating the Q JAKE. Dixie Marine also should have known about the unsuitability of the wharf because most of the damages it alleges actually pre-existed the Q JAKE incident. Furthermore, the deteriorated condition of the substructure underneath bollard no. 4 had been exposed on the wharf since 2012.[21]

---

[20] Exhibit 105 at 9, Excerpts from Nelson Documents.
[21] In 2012, Bollard No. 4 was ripped off the wharf by another vessel. The damaged foundation revealed corroded rebar and dark and deteriorated wood framing beneath the bollard.  Dixie Marine has never replaced the bollard. *See* Janowsky Testimony.

44.

With the exception of replacing the foundation underneath bollard no. 6 following the fire in 2013, the repair projects did not involve any enhancement or repair of the wharf's bollards or its mooring capacity.

45.

The Court also finds that bollards nos. 1 and 2 failed because they were attached to the wharf with excessively corroded anchor bolts. The Q JAKE's forensic expert in marine structural engineering, William Janowsky, was the only expert to specifically analyze the wharf's mooring points. The Court gives significant weight to his testimony. Janowsky stated that the allowable capacity of a bollard is a function of its installation and its parts. He explained that although the rated capacity of the bollards was 50T, the allowable capacity of the bollards was actually less than 26.6T because they were assembled with four one-inch diameter bolts instead of one-and-one-quarter inch diameter bolts and the bolts were corroded.[22] Janowsky further concluded that bollards no. 1 and 2 failed because the bolts sheared off the concrete pedestal due to their reduced capacity.

---

[22] Exhibit 119 at 5, Janowsky Report.

The Court finds bollard no. 7 failed because it was attached to deteriorated and negligently maintained timber. Janowsky noted that the bolts in bollard no. 7 did not shear; in fact, they held fast to the timber substructure beneath the concrete deck. However, Janowsky concluded that bollard no. 7 failed because that timber was charred, black, and deteriorated.[23]  Janowsky testified that the condition of the timber under bollard no. 7 most likely stemmed from the fire in 2013 because it appeared to be very similar to the charred wood depicted in photographs of bollard no. 6 from that time.[24] Dixie Marine's engineer, Don Barnes, admitted at trial that he did not remove all of the damaged and charred wood after the 2013 fire.[25]

## **Damages**

47.

Dixie Marine claims that Q JAKE's forward mooring lines, attached to bollards no. 1 and 2, lifted the concrete deck vertically to such an extent that the steel supports underneath fell over and large pieces of concrete fell off the wharf. Photographic evidence, however, shows that this damage pre-existed the incident.[26]  Dixie Marine also claims that the vessel's stern

---

[23] Exhibit 119 at 15, Janowsky Report; *see also* Exhibit 70 at 3, Fernandes Report; Exhibit 103 at 91, Barnes 2013 Repairs.
[24] Exhibit 117 at 15.
[25] Don Barnes Testimony.
[26] Exhibits 119 at 6, 17-20, Janowsky Report;

lines snapped unexpectedly, cracking bollards no. 9 and 13 and their foundations. Janowsky testified that some of the cracks appear to have pre-existed the incident.

48.

Dixie Marine obtained a $263,000.00 quote from its contractor to repair the damage to the wharf. Dixie Marine has not made any repairs to the wharf since the incident.

49.

The Q JAKE claims a total of $58,211.00 in damages. Specifically, the Q JAKE claims additional pilot fees in the amount of $2,126.20; tugboat expenses in the amount of $47,194.50; replacement mooring lines in the amount of $4,843.76; and surveyor fees in the amount of $4,046.54.

**CONCLUSIONS OF LAW**

1.

This is a case of admiralty and maritime jurisdiction, brought under the provisions of the Admiralty Extension Act, 46 U.S.C. § 30101; 28 U.S.C. § 1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.

Dixie Marine has a sufficient proprietary interest to recover economic loss for its damage or loss of use because it has (1) actual possession or control, (2) responsibility for repair, and

(3) responsibility for maintenance. *Louisville & N.R.R. v. The Bayou Lacombe*, 597 F.2d 469, 474 (5th Cir. 1979); *see also Diversified Group, LLC v. Louisiana Carriers, Inc.*, 12-1161, 2013 WL 2147547, at *2 (E.D. La. May 15, 2013).

## The Louisiana and Oregon Rules

3.

Dixie Marine invokes the *Louisiana* Rule and the *Oregon* Rule, either of which create a rebuttable presumption of fault against a moving vessel when it allides with a stationary object. *See The Oregon*, 158 U.S. 186, 197 (1895); *The Louisiana*, 70 U.S. 164, 168 (1865).

4.

Courts recognize that the presumptions apply to different types of situations. The *Louisiana* Rule applies to vessels that are not operating under their own power and drift into other property as a result of external forces such as wind or current. *The Louisiana*, 70 U.S. at 168. The *Oregon* Rule applies to vessels operating under their own power which allide with stationary objects. *The Oregon*, 158 U.S. at 197; *see also Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 602 (5th Cir. 2010).

5.

Application of either presumption will satisfy the plaintiff's *prima facie* case of negligence. *Brown & Root Marine Operators v. Zapata Off-Shore, Inc.*, 377 F.2d 724, 726 (5th Cir.

1967). However, the scope of the rules are limited to a presumed breach on the part of the alliding vessel and not a presumption of causation (either in cause or in fact) or the percentages of fault assigned to negligent parties. *In re Mid-S. Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005).

6.

Presumptions of fault do not supplant the traditional duty, breach, causation, and injury analysis. *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 605 (5th Cir. 2010). They are merely evidentiary devices "designed to fill a vacuum." *Id*. "Once evidence is presented . . . presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *Id*. (internal quotations and citations omitted).

7.

A vessel may rebut the presumption by showing by a preponderance of the evidence: (1) the allision was the fault of the stationary object, (2) the vessel acted with reasonable care, or (3) the allision was an unavoidable accident. *Am. Petrofina Pipeline Co.*, 837 F.2d at 1326 (citing *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 (5th Cir. 1977)).

8.

The Fifth Circuit has recognized that in order to apply the *Oregon* or the *Louisiana* Rules the contact between a vessel and a

stationary object "must rise to a certain minimal level before it constitutes a collision." *Id*. The presumptions will not apply where contact between a vessel and stationary mooring object occurred during "normal" mooring procedures, and when the object should have been able to withstand the handling of the vessel without damage. *Id*. (citing *Phillips Petroleum Co. v. Trinidad Corp.,* 1979 A.M.C. 1352, 1358 (M.D. Fla. 1978)).

9.

Here, the *Louisiana* Rule is inapplicable because the Q JAKE was constantly under its own power and was not a drifting vessel.

10.

The Court also finds that the *Oregon* Rule does not apply to the facts of this matter. The incident at issue was not a berthing incident, but rather a mooring incident. In other words, the forces that were exerted onto the wharf were not a result of the Q JAKE making contact with the wharf. In fact, the Q JAKE itself did not make contact with the wharf at any point in time. Rather, the forces that caused damage to the wharf were from the Q JAKE's mooring lines pulling on the bollards as the river current pushed the vessel away from the wharf.  Because there was insufficient contact to consider this incident an allision, the *Oregon* presumption does not apply.

11.

Even if the *Oregon* presumption were to apply, the Court finds that Q JAKE rebutted any such presumption by proving that this incident was the result of a defective wharf.

**The Pennsylvania Rule**

12.

The *Pennsylvania* Rule imposes a presumption of causation on a vessel involved in an allision or collision if the vessel was in actual violation of a statutory or regulatory rule that is intended to prevent such incidents. *The Pennsylvania,* 86 U.S. 125, 136 (1873); *see also Petro United Terminals, Inc. v. J.O. Odfjell Chem. Carriers*, 756 F. Supp. 269, 274 (E.D. La. 1991).

13.

A plaintiff must establish three elements for the *Pennsylvania* Rule to apply: "(1) proof by a preponderance of the evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; and (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Folkstone Maritime, Ltd. V. CSX Corp*., 64 F.3 1037, 1047 (7th Cir. 1995).

Dixie Marine attempts to avail itself of the *Pennsylvania* Rule by arguing that the Q JAKE had insufficient mooring lines and a fatigued crew in violation of 33 CFR 162.80(b)(1) and 46 CFR 15.1111.

33 CFR 162.80(b)(1) provides: "When tied up individually or in fleets, vessels shall be moored with sufficient lines and shore fastenings to insure their remaining in place and withstanding the action of winds, currents and the suction of passing vessels." 46 CFR 15.1111 prescribes work hours and rest periods for crew members. Specifically, it requires a minimum of 10 hours of rest in any 24-hour period and 77 hours of rest in any 7-day period.

As discussed above, the Court finds that there was insufficient contact to consider this incident an allision; therefore, the *Pennsylvania* Rule does not apply. To the extent that the *Pennsylvania* Rule may apply, the Court finds that Dixie Marine has failed to establish a safety violation.

At the time of the mooring operations at the Andry Street wharf, the Q JAKE crew was in full compliance with the work hour and rest period requirements of CFR 15.1111. Dixie Marine's counsel conceded the point at trial.

Furthermore, the Court finds that the Q JAKE utilized sufficient mooring lines and fastenings in compliance with 33 CFR 162.80(b)(1). The fact that lines parted alone is insufficient to prove the lines were not suitable for their intended purpose or that there were too few out at the time. Expert testimony showed that mooring lines are designed to break at a certain point and generally should part before a bollard fails.[27]  In fact, the mooring equipment utilized by the Q JAKE was certified and confirmed by Captain Ryan to be "suitable for its intended use."[28]

19.

Dixie Marine has failed to show by a preponderance of the evidence that the Q JAKE violated 33 CFR 162.80(b)(1) or 46 CFR 15.1111. Accordingly, the Court will not apply *The Pennsylvania* presumption against the Q JAKE for any alleged crew fatigue or insufficient line equipment.

## **Negligence of the Q JAKE**

20.

In the absence of any presumption, traditional common law principles of negligence apply to claims under general maritime

---

[27] *See* Captain Ryan testimony; William Janowsky testimony; Captain Scruton testimony; Exhibit 117 at 6, Captain Scruton Report.

[28] Exhibit 118 at 6, Captain Ryan Report. Specifically, Captain Ryan also testified that the mooring equipment was designed to safely hold the vessel at a fully loaded condition with external forces of a 40-knot wind and a 6-knot current.

law. *See Canal Barge Co. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir. 2000).

21.

In a maritime tort case, the plaintiff has the burden of proving by a preponderance of the evidence that the defendant owed a duty to the plaintiff, there was a breach of that duty, the plaintiff suffered an injury, and there is a causal connection between the defendant's conduct and the plaintiff's injury. *In re Katrina Canal Breaches Consol. Litig.*, 05-5724, 2011 WL 1792542, at *19 (E.D. La. Jan. 20, 2011) (citations omitted).

22.

"The existence and scope of a duty under the general maritime law turns primarily on the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).

23.

The test and standard for a finding of negligence is reasonable care under the circumstances. *Folkstone Mar., Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995)

24.

A vessel is liable *in rem* for the damages caused by the negligence of a compulsory pilot. *Probo II London v. M/V ISLA SANTAY,* 92 F.3d 361, 365 (5th Cir. 1996). A compulsory pilot's decisions are not negligent if they are the decisions a competent

compulsory pilot might reasonably have made under the same circumstances. *Virginia Int'l Terminals, Inc. v. M/V KATSURAGI*, 263 F. Supp. 2d 1025, 1037 (E.D. Va. 2003).

25.

A compulsory pilot "is in supreme command of the vessel while he is navigating her." *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 218 (3rd Cir. 1993). A vessel's master retains the authority to countermand a pilot's orders which would place the vessel in a position of apparent and avoidable danger. *Delta Transload Inc. v. The Navios Commander*, 818 F.2d 445, 451 n.17 (5th Cir. 1987).

26.

Causation has two sub-elements: "(a) cause in fact and (b) proximate or legal cause." *In re Mid South Towing Co.,* 418 F.3d 526, 532 (5th Cir. 2005). To establish cause in fact, the plaintiff must show that the incident would not have occurred but for the defendant's negligence. *In re Katrina Canal Breaches Consol. Litig.*, 2011 WL 1792542, at *20.

27.

"[W]here there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident." *Id.* (quoting *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.,* 2002-282 (La. App. 4 Cir. 12/30/2002), 837 So. 2d 96, 102). If the plaintiff's injury would

have occurred in the absence of the defendant's act or omission, then the defendant's conduct is not a substantial factor. *Id*. (citing Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §5-3 (4th ed. 2004)).

28.

"Proximate cause involves a policy determination as to whether the plaintiff's injuries were a reasonably foreseeable result of the defendant's alleged negligent conduct." *Id*. (citing *Consolidated Aluminum Corp.*, 833 F.2d at 68).

29.

The Court finds that the Q JAKE did not breach its duty to approach the wharf with reasonable skill and care and to avoid causing damage to it. *See Bunge Corp.,* 588 F.2d at 799. The evidence shows that the Q JAKE's mooring operations were consistent with local custom and prudent seamanship. As already discussed, the number and condition of the mooring lines utilized by the Q JAKE was not negligent.

30.

The Court finds that the use of two tugs during the first mooring attempt was not negligent. Alternatively, if the use of two tugs during the first attempt was negligent, it was not the cause of the damage to the wharf because the failure of bollard no. 7 would have occurred with or without the use of more tugs.

Similarly, the Q JAKE was not negligent for using four tugs to dock the vessel on the second attempt and then three tugs to maintain the vessel alongside the wharf. It was the condition of the wharf and not the number of tugs that caused damage to the wharf. Accordingly, the Court concludes that the Q JAKE was not negligent in its mooring attempts at the Andry Street wharf.

## Negligence of Dixie Marine

32.

A wharfinger is not the guarantor of the safety of a ship berthing at his wharf, but he is under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977).

33.

A wharfinger must ascertain the condition of his berth and warn the vessel of any hidden hazard or deficiency known to the wharfinger or, in the exercise of reasonable care and inspection, should be known to him. *Id*.

34.

There is no duty to warn if the wharf's hazard or deficiency is open and obvious to those in control of the vessel or if those persons have actual knowledge of the condition. *Id*. (citing *Delta*

*Commodities, Inc. v. M/T JO OAK*, 88-1349, 1989 WL 149253, at *3
(E.D. La. Dec. 6, 1989)).

35.

Dixie Marine is responsible for maintaining and operating the
Andry Street wharf in a suitable and safe condition. Dixie Marine
had the duty to exercise reasonable care and inspection to furnish
a safe berth and warn the Q JAKE of any hidden hazard or deficiency
that was known to Dixie Marine or should have been known to it.

36.

The Court finds that Dixie Marine breached its duty as
wharfinger by failing to provide a safe berth and failing to warn
the Q JAKE of its hidden deficiencies that were known to Dixie
Marine or shown have been known to it.

37.

Based on, *inter alia*, the 2014 Nelson Report, the minimal
repairs performed by Dixie Marine over the years, and Dixie
Marine's correspondence with the Port, Dixie Marine knew or should
have known that the wharf was in a deteriorated state and was an
unsafe berth for the Q JAKE, especially in high river conditions.[29]
As described above, the Port repeatedly expressed its concern over
the integrity and capacity of the wharf. Dixie Marine acknowledged

---

[29] See Exhibit 93, 2013 Port Internal Memorandum; Exhibit 80, 1/15/15 Letter
from Dixie Marine to the Port; Exhibit 101, 1/30/15 letter from the Port to
Dixie Marine.

the concern and the need for repairs but failed to make substantial improvements.

38.

Expert testimony demonstrated that Dixie Marine knew or should have known that the Q JAKE was loaded. Dixie Marine had a responsibility to verify that the wharf had the necessary capacity to safely accommodate the vessel in its current condition and failed to do so.[30]

39.

The Q JAKE had no knowledge of the defects and deficiencies of the wharf because they were hidden and not open or obvious. The deteriorated state of the wharf's substructure and bollard anchors was hidden below the concrete deck and out of the view of the crew. Moreover, the Nelson Reports and other documents discussing the deteriorated state of the wharf's substructure were only available to Dixie Marine, the Port, and those involved in the repairs.

40.

The Court finds that Dixie Marine's negligence was the sole and proximate cause of the damage to the wharf. Bollards nos. 1 and 2 failed because of the deteriorated and corroded condition of

---

[30] Dixie Marine's Vice President, who was present at the wharf for the second mooring attempt, testified that he may have known about the Q JAKE's loaded condition. However, he stated that even if he knew about the cargo, it would not have prevented him from approving the Q JAKE's berth because, according to Dixie Marine, the wharf had no limitations.

their bolts.[31] Bollard no. 7 failed because it was attached to heavily deteriorated and charred timber substructure. To the extent that the Q JAKE was negligent in any respect, the bollards were in such poor condition that the damage would have otherwise occurred.

41.

Dixie Marine also did not communicate any risks to the Q JAKE either before or during the mooring attempts. Had Dixie Marine warned the Q JAKE, or had Dixie Marine notified local pilots' associations and local agents, of the condition of the wharf, the Q JAKE could have considered the risk, especially during high river conditions.

42.

Accordingly, the Court concludes that Dixie Marine was negligent for failing to provide a safe berth and for failing to warn the Q JAKE of its hidden defects, and that such negligence was the sole and proximate cause of the damage to the wharf.

**Damages**

43.

Where the appropriate measure of damages is the cost of repairs, a party incurring property damage is entitled to no more

---

[31] A post-incident survey revealed that many of the anchor bolts to the Andry Street wharf exhibited significant corrosion, which reduced the effective diameter of the steel bolts and reduced the capacity of the bollards. (Exhibit 119, William Janowsky Report.

than restoration of the property to its condition prior to the accident. *City of New Orleans v. Am. Commercial Lines, Inc.*, 662 F.2d 1121, 1124 (5th Cir. 1981); *see also Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa,* 761 F.2d 229, 233 (5th Cir. 1985).

## 44.

The party at fault for a maritime accident bears the cost of damage surveys. *In Re M/V Nicole Trahan*, 10 F.3d 1190, 1196 (5th Cir. 1994)

## 45.

Because the Q JAKE was not negligent during the attempted mooring at the Andry Street wharf nor otherwise liable to Dixie Marine, the Q JAKE owes no damages to Dixie Marine.

## 46.

As to the Q JAKE's damages, the Q JAKE claims a total of $58,211.00. Specifically, the Q JAKE claims additional pilot fees in the amount of $2,126.20; tugboat expenses in the amount of $47,194.50; replacement mooring lines in the amount of $4,843.76; and surveyor fees in the amount of $4,046.54.

## 47.

The Court finds these damages are reasonable under the circumstances and awards these amounts to the Q JAKE. Accordingly, the Court awards $58,211.00 in compensatory damages to the Q JAKE.

48.

Generally, prejudgment interest should be awarded in a maritime case unless there are exceptional circumstances, such as undue delay by the prevailing party in bringing suit. *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 195 (1995). The rate of prejudgment interest, as well as the date from which it accrues, is within the Court's discretion. *See* Thomas J. Schoenbaum, *Admiralty and Maritime Law*, §5-3 (4th ed. 2004)). The Court finds that the Q JAKE is entitled to prejudgment interest at a rate of 6% from the date of the incident until paid.

49.

The general rule is that litigants are responsible for their own attorneys' fees. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 257 (1975). However, federal courts possess "inherent power" to assess fees as sanctions when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). The Court finds no reason to assess attorneys' fees as sanctions. Accordingly, the parties shall be responsible for their own attorneys' fees.

50.

The Q JAKE's costs other than attorneys' fees shall be borne by Dixie Marine according to Federal Rule of Civil Procedure 54(d).

In the Fifth Circuit, under general maritime law, punitive damages may be imposed for reckless, willful and wanton conduct. *In Re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico on April 20, 2010*, 21 F. Supp. 3d 657, 749 (E.D. La. 2014). There is no evidence that Dixie Marine's negligence was willful or wanton, thus the Q JAKE is not entitled to punitive damages.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Q JAKE is not liable to Dixie Marine, and Dixie Marine is liable to the Q JAKE in the amount of $58,211.00 plus prejudgment interest at a rate of 6% running from the date of the incident until paid. All costs other than attorneys' fees shall be borne by Dixie Marine in accordance to Federal Rule of Civil Procedure 54(d). Judgment will be entered accordingly.

New Orleans, Louisiana, this 22nd day of August, 2017.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE